### EASTERN COAL & EXPORT CORPORATION v. SEWALLS POINT COAL EXCH., Inc.

(Circuit Court of Appeals, Fourth Circuit.   March 31, 1923.)

#### No. 2063.

1. **Exchanges ☞8—Demurrage charged by coal exchange under by-laws held charge for storage, and not penalty against members.**

    A charge made by the by-laws of a coal exchange against the members of the exchange, equal to the demurrage which the railroads would charge the coal exchange if the member's coal remained in one car during the period it had a coal credit at the exchange, but which the exchange was not required to pay to the railroads, because other members had not left their coal in the cars the length of time permitted, is merely a charge against the member for storage in cars, and is not a penalty, even though it is designated in the by-laws as a penalty, and therefore does not violate the provision of a state statute that a corporation may not, for a breach of a by-law, impose a fine exceeding $20.

2. **Exchanges ☞8—Demurrage for each car each day charged by coal exchange held separate charge, so as not to violate state law limiting fine.**

    Charge by coal exchange against its members of $2 a day for each car occupied by a member's coal after the expiration of the demurrage period is a separate charge as to each car for each day, so that it does not, even if it is considered a penalty, violate a state law limiting

the fine which a corporation may impose for violation of its by-laws to $20 though the total amount of such charge against a member exceeded $20.

In Error to the District Court of the United States for the Eastern District of Virginia, at Richmond; D. Lawrence Groner, Judge.

Action at law by the Sewalls Point Coal Exchange, Incorporated, against the Eastern Coal & Export Corporation. Judgment for plaintiff, and defendant brings error. Affirmed.

S. S. P. Patteson and J. H. Rives, Jr., both of Richmond, Va. (Berkeley Cox, of Richmond, Va., on the brief), for plaintiff in error.

Gibbs L. Baker, of Washington, D. C., and Sherlock Bronson, of Richmond, Va. (Clarence A. Miller, of Washington, D. C., on the brief), for defendant in error.

Before WADDILL and ROSE, Circuit Judges, and McCLINTIC, District Judge.

ROSE, Circuit Judge. The defendant in error was plaintiff below, and the plaintiff in error the defendant, and they will be so designated here. Each of them is a corporation, the former of Delaware, the latter of Virginia. The plaintiff had no capital stock, and as a corporate entity was not to be operated for its own profit, although one of its chief ends was to make, or rather to save, money for its members in their individual capacities. The plaintiff was not incorporated until June, 1920, some months after the federal control of the railroads had come to an end, and not until some years of experience with coal exchanges had familiarized the trade with them. They were intended to get all the use possible out of the available transportation facilities, whether they were tracks, cars, terminal yards, piers, ships, or what not. Much time and money would be saved, if all the coal which came to a particular port was owned by one man, who was also the only person who shipped that commodity from it. Whenever a collier arrived in the harbor, all that would concern him was whether there was then in the terminal yard enough coal, of the kind she was to take, to make up her cargo. If there was, he would take the coal from whatever cars could most conveniently, quickly, and cheaply be brought to the pier. When scores or hundreds of shippers use the same port, causes of delay are many. A ship arrives consigned to A., who is under contract to furnish her with 8,000 tons of grade No. 1 coal. He has but 4,000 tons at the terminal. The ship must wait until his other 4,000 tons come in, although 10,000 tons belonging to other shippers may be in the cars awaiting vessels which have not yet reported. The railroad must pick out his cars from among all the others standing on the tracks, and that takes time, labor, and money.

The coal exchanges were intended to handle the physical coal as if they were its owners. The coal of every member of one of them was consigned to it. So soon as the coal left his siding he was credited with it on the books of the exchange. If he had a ship ready and he had enough coal to his credit, it was loaded and sailed away. It made no difference that the cars which held the coal which actually came from his mines were still many miles from the water front. Where

they were bothered no one. All the coal on the tracks was treated as if it had been so much wheat in an elevator. Of course, there are different kinds and qualities of coal, as there are of wheat, and each was graded; but in this case the fact that there were many classes, or as the phrase went, pools of coal, and that the exchange kept a separate account of each sort, does not enter into our problem, and need not be further referred to.

Efficient as the exchanges could be made in eliminating many causes of delay, it was possible that under conceivable circumstances they might in actual practice tempt some of their members to use them as facilities for procrastination. The railroad charge of $2 per day for detention of a car over five days gave a shipper who was liable for it a motive for prompt unloading. An exchange might take away some of this incentive. With all the coal consigned to it, shipments might be made so speedily that no demurrage could be charged up against it, although some of the members had sent coal to tidewater without providing any ship to take it away. In certain states of the market, there was a strong temptation to do this very thing, and perhaps it never was stronger than in the months with which this case is concerned, namely, those of the late summer and early fall of 1920. Almost any figure could at times be obtained for spot coal; that is, coal at tidewater which could be delivered at once. With the price going up by leaps and bounds, to hold coal in the cars paid one who wished to get the top of the market; but it involved the very waste of the use of equipment the exchanges were organized to prevent. Sometimes a member's coal was detained at tidewater because of conditions which he could not control; sometimes because he was waiting for a rise. The exchange could not undertake to determine which was true, nor was there any reason why it should. In any event the shipper had had the use of a car as a place of storage for his coal, as a shipper of wheat under similar circumstances would have had the use of a bin in an elevator. In one case as in the other he should pay for it and the rules of the exchange were drawn to insure that he should. When demurrage had to be paid provision was made for apportioning it among those members whose detention of the cars had subjected the exchange to the liability. But, as happened during the period with which we are here concerned, there might be no demurrage charged against the exchange. The efficiency of the management and the promptness of the majority of its members may have offset the tardiness of the few. The latter, nevertheless, had for their own purposes used the facilities which the co-operative action of the exchange had made available to a markedly greater extent than had their fellows, and it was only fair that they should pay for such use.

[1] That is what the judgment below required the defendant to do. It had used the cars as storehouses. It was able to do so without subjecting itself to liability to the railroad for demurrage, because and only because its fellow members in the interest of the exchange and of the public had refrained from using all the storage to which they were entitled and had in effect put it at the service of the defendant. They had, however, never undertaken to render this service gratuitously.

The by-laws of the exchange, which were in effect the agreement under which the members united themselves, provided that the defendant or any one else who had this advantage should pay for it $2 per day per car, the rate which the experience and usage of many years had fixed as the reasonable value of the use of a car. It is of no moment that, when the defendant made application for membership in the exchange, it may not have known of this by-law for it learned of it not long after and before it made use of the cars for which it is now charged. In our judgment that is all there is in this case. Much ability, industry, and learning have been expended on behalf of the defendant in arguing that, as this rental is called in the by-laws a penalty, it is not collectable, because under the laws of Delaware a corporation may not for a breach of a by-law impose a fine exceeding $20. The mere fact that the parties called it a penalty does not make it so, although, in a case otherwise doubtful, such fact might well be decisive; but here there is no possibility of doubt as to what it really is. It is precisely as if a country club required every member to pay $2 for any day he played upon its golf course. It might, if it chose, call it the exaction of a penalty for playing golf; but it would nevertheless remain as an equitable way of providing a part of the cost of facilities which the club had created, but which some of its members did not use at all, some but seldom, and others very frequently.

[2] Moreover, if the $2 a day could in any sense be deemed a penalty, there is nothing in the laws of Delaware to prohibit its imposition. Under the circumstances of this case, the rent, the charge, the penalty, or whatever else you choose to call it, is $2, and no more. Each day's use of each car is separate and distinct from every other. The cases to the contrary cited by the learned counsel for the defendant are not in point. When the prohibited thing is the following of one's ordinary calling on Sunday, a baker on a particular Sunday commits but one offense, no matter how many loaves he sells, for to sell as many as he can is his ordinary calling. Crepps v. Durden, 1 Cowper, 640. The having on any particular day on one's premises a quantity of gunpowder more than the ordinance permits is but one violation of the by-law. The extent of the excess may aggravate the offense, but it does not make it a plural offending. Mayor of New York v. Ordrenan, 12 Johns. (N. Y.) 22. But the situation here has nothing in common with the facts of those cases. What has been said necessarily requires the affirmance of the judgment below. As the by-law was in fact reasonable, and the jury so found, the question as to whether the determination of its reasonableness was for court or jury has become immaterial.

Affirmed.